(No. 69877.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PATRICK HENRY WRIGHT, Appellant.

*Opinion filed May 21, 1992.—Rehearing denied June 25, 1992.*

40

Charles M. Schiedel, Deputy Defender, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Assistant Attorney General, of Chicago, of counsel, and Michael M. Glick, law student), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In 1983, following a jury trial in the circuit court of Coles County, Patrick Wright was found guilty of home invasion (Ill. Rev. Stat. 1981, ch. 38, par. 12—11), residential burglary (Ill. Rev. Stat. 1981, ch. 38, par. 19—3), armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)), attempted rape (Ill. Rev. Stat. 1981, ch. 38, par. 8—4(a)), attempted murder (Ill. Rev. Stat. 1981, ch. 38, par. 8—4(a)) and murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)). Defendant waived the jury for purposes of sentencing and the court found him eligible for the death penalty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)), as defendant was older than 18 years of age and had committed the murder during the commission of another felony. After weighing aggravating and mitigating factors, the court sentenced defendant to

death on the murder conviction and imposed sentences of 60 years' imprisonment for home invasion, armed robbery and attempted murder and 30 years' imprisonment for each of two counts of attempted rape. We affirmed both the finding of guilt and the sentence. *People v. Wright* (1985), 111 Ill. 2d 128.

The United States Supreme Court denied *certiorari* (*Wright v. Illinois* (1987), 479 U.S. 1101, 94 L. Ed. 2d 179, 107 S. Ct. 1327) and a petition for rehearing was subsequently denied (*Wright v. Illinois* (1987), 481 U.S. 1024, 95 L. Ed. 2d 519, 107 S. Ct. 1914).

The defendant then sought post-conviction relief pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1987, ch. 38, par. 122—1 *et seq.*). The circuit court of Coles County denied all post-conviction relief. The post-conviction proceedings were appealed directly to this court, pursuant to Supreme Court Rule 651(a) (134 Ill. 2d R. 651(a)).

The defendant raises several issues in this post-conviction appeal, contesting not only the constitutional propriety of the original trial proceedings, but alleging also that the post-conviction proceedings were constitutionally deficient. Specifically, defendant's petition raises the following issues: (1) whether defendant was denied his sixth amendment right to the effective assistance of counsel in the original proceedings where counsel failed to obtain additional mental health records of defendant; (2) whether the post-conviction court's denial of defendant's motion seeking funds to appoint an additional psychiatric expert was an abuse of the trial court's discretion and amounted to a violation of defendant's due process and equal protection rights; (3) whether post-conviction counsel's failure to supplement defendant's *pro se* contentions with affidavits or other documentation violated Supreme Court Rule 651(c); and (4) whether defendant was denied a fair sentencing hearing where

the sentencing judge enumerated "residential burglary" as an aggravating factor justifying imposition of the death penalty. We conclude that none of these issues is meritorious and accordingly deny post-conviction relief.

## BACKGROUND

In 1983, after a jury trial, defendant was convicted of home invasion, residential burglary, armed robbery, attempted rape, attempted murder and murder. The facts concerning these crimes are set forth in detail in this court's earlier opinion (*People v. Wright* (1985), 111 Ill. 2d 128), and only a brief review is now necessary. Further facts pertinent to the resolution of the issues raised will be addressed where necessary throughout the discussion.

On the evening of June 6, 1983, defendant entered the apartment of Carol Specht, carrying a flashlight and a fillet knife. At that time, Specht was asleep on the living room sofa. When she awoke, defendant attempted to rape her but failed. Defendant then bound Specht and searched the apartment, eventually finding Specht's daughter, Connie. At that point, defendant tried to rape Connie but, again, failed in his attempts. Becoming frustrated, defendant slashed Connie's throat three times and then stabbed Carol Specht several times. Carol Specht died from the wounds inflicted by defendant. Defendant left the apartment, taking with him some personal property of his victims.

Defendant was soon apprehended by the police. Because of defendant's indigent status, the court appointed Brian Silverman, the public defender of Champaign County, to represent the defendant. Silverman was assisted by James Dedman.

Defendant apparently suffered from a "shoe fetish" and had been hospitalized for 15 years in state mental institutions for treatment because of this disorder.

Defendant's theory at trial was that this shoe fetish rendered him insane at the time he committed the crime.

Because defendant's mental state was at issue, the court authorized funds for the appointment of two psychiatrists to examine the defendant and to render an opinion as to his sanity at the time of the offense. One psychiatrist was to be chosen by the State and one by the defense.

In rebuttal at trial, the State introduced the testimony of Dr. William Fowler, a psychiatrist. Dr. Fowler indicated that he did not believe that defendant had been suffering from any mental illness at the time of the crimes. Rather, Dr. Fowler characterized defendant's condition as a personality or psychosexual disorder. The defense did not call its psychiatric expert at trial.

Rejecting defendant's insanity defense, the jury found the defendant guilty on all counts as charged. Upon the advice of counsel, defendant elected to waive the jury for the sentencing phase of the trial.

At the sentencing hearing, defendant introduced the testimony of Dr. Arthur Traugott, a psychiatrist, in order to establish the existence of mitigating factors. Although Dr. Traugott determined that defendant was suffering from mental illness on the evening in which the crimes were committed, Dr. Traugott also felt that defendant understood what conduct was wrong and how to conform his conduct to the requirements of the law. No further mitigating evidence was produced. Defendant was sentenced to death.

## I

The first issue the defendant raises is whether he was denied his sixth amendment right to the effective assistance of counsel. Defendant alleges that his trial counsel's failure to discover "over a thousand" pages of medical records in the possession of the Illinois Department of

Mental Health and Developmental Disabilities (Department) and the Social Security Administration resulted in great harm to him. Defendant's claims are varied. Among other things, he claims that the failure to use these records in mitigation deprived him of his eighth amendment and fourteenth amendment rights and the absence of these records denied him a fair trial and sentencing hearing, as they could have been used to more effectively cross-examine Dr. Fowler and would have supplied significant evidence of his troubled youth. As we explain below, however, defendant's allegations lack merit.

Claims of ineffective assistance of counsel are analyzed using rules set forth in the Supreme Court's decision in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504.

As *Strickland* noted, "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.) In order to determine whether counsel's conduct amounted to such a violation, *Strickland* established a two-pronged test by which all claims that defendant was denied the fair and effective assistance of counsel are subjected to rigorous scrutiny. This test is succinctly stated as follows:

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

We must therefore analyze defendant's claim that counsel at trial denied him the effective assistance of counsel by implementing this two-part test. (See, *e.g.*, *People v. Albanese* (1984), 104 Ill. 2d 504.) Per *Strickland*, should defendant be unable to establish either prong of this test, his claim shall fail. We are also mindful that defendant must overcome a strong presumption that counsel's performance at trial and sentencing fell within a wide range of acceptable behavior. See *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

In analyzing the first factor, *Strickland* concluded that the proper measure of attorney performance should be based upon a "reasonableness" standard. (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064-65.) The overriding concern where a claim is advanced that counsel's representation was deficient is that defendant received a fair trial. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) As *Strickland* notes, "the [reviewing] court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Applying these concepts to the instant case, we conclude that counsel's decisions at trial were reasonable and af-

forded defendant a fair forum in which to defend himself.

In the post-conviction petition which defendant filed *pro se* after his conviction and death sentence were affirmed by this court, defendant alleged that over 1,000 pages of his mental health records were held at the Department and that the Social Security Administration also possessed "voluminous documentation encompassing over 30 years of investigation and accumulation on petitioner's mental health history." His post-conviction counsel, Robert McIntire, and an "associate" reviewed the records and determined that, contrary to defendant's assertions, there were approximately 50 pages of relevant information contained in these reports from the Department. Our review of these undiscovered mental health records tells us that much of this information was repetitive. It was also determined that the records from the Social Security Administration were largely duplicates of the records at the Department. Therefore, defendant's argument, in essence, is that Silverman should have investigated further and discovered the additional 50 pages of psychiatric documentation.

The record is clear that Silverman received an "extensive" number of psychiatric documents from the State's Attorney concerning the defendant. However, Silverman, through his witnesses, did not fail to conduct a further investigation into the matter of the defendant's mental health history. Dr. Traugott, the psychiatrist selected to examine the defendant by the defense, apparently wrote to the Department and requested all documents in its possession concerning the defendant.

At the time of trial, it was believed that all relevant records from the Department had been received, thus making further investigation concerning defendant's mental health records housed at the Department unnecessary. This was made evident at a deposition taken of

Dr. Traugott before the post-conviction hearing, where Dr. Traugott stated, "What I was amazed to find in here was, when I wrote to the Department of Mental Health and Developmental Disabilities and asked for records I was sent some records which I alluded to in here. *My assumption at that time was I was given what records were available.* *** In reviewing this packet of information I came across reports in which there were psychiatric diagnoses which if I would have had at the time I prepared this report I would have had to address in my letter to the judge concerning these diagnoses." (Emphasis added.)

Silverman's access to the particular documents which he did possess enabled him to conduct effective examinations of both psychiatric experts who testified at trial, thereby maintaining a strong adversarial posture at trial and during the hearing on aggravation and mitigation. Silverman's performance, aided by the documents in his possession, certainly kept intact "the adversarial testing process," as *Strickland* requires. Silverman was assisted in his examination of Dr. Traugott by his exposure to the information contained in the medical records. He also used the medical records and the information contained therein to cross-examine Dr. Fowler, the psychiatric expert called to testify at trial by the State.

Silverman made reference to these reports from the Department during his examination of Dr. Traugott at the hearing in aggravation and mitigation. During Dr. Traugott's testimony, Silverman established that Dr. Traugott's conclusions were based upon information contained in the medical reports, as well as his own examination of defendant. Silverman also asked Dr. Traugott about the extent of defendant's hospitalization and the medical records which corresponded to the number of years defendant spent in the hospitals.

Further, after a rigorous cross-examination of the State's psychiatric witness in which Silverman managed to damage Dr. Fowler's credibility, the following dialogue took place:

"Q. [SILVERMAN]: *** Now, Doctor, when you were examining him [defendant], you told us that you took into consideration these police reports and the statement he gave and the reports from the penal institution. Did you take into consideration the reports from 1959 through 1973 when he was in mental institutions in Illinois? Did you take these into consideration?

A. [DR. FOWLER]: I have no records from his mental institutionalizations.

Q. Then it is correct to say that no, you did not take that into consideration in making your conclusion, is that correct?

A. That is correct, counselor.

Q. Did you know that he spent over fifteen years consecutively without a break in mental hospitals in this state? Did you know that?

A. That is what he told me.

Q. Well, did you do anything to check it out?

A. No, I did not.

Q. Did you ask the State's Attorney to check it out for you?

A. I did not."

Silverman's knowledge of the existence of certain medical reports and their contents was very evident throughout the proceedings and assisted him in serving as a zealous advocate of his client's claim at both trial and sentencing. It may have been even more effective to have had the records indicating a possible diagnosis of schizophrenia; however, it is not reasonable to judge counsel's performance based upon "hindsight." We must "evaluate" counsel's performance "from counsel's perspective at the time." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) At the time, Silverman's conduct was reasonable.

Our disposition of this prong of the *Strickland* standard makes an analysis of the prejudice standard unnecessary. (See *People v. Bean* (1990), 137 Ill. 2d 65, 131 ("reviewing court may dispose of claim by applying either component and, if it is not proved, need not consider the other component"), citing *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) However, our review of the issues raised by defendant indicates that it is also impossible to establish that defendant was prejudiced by the errors alleged to have been committed by counsel.

Defendant raises three arguments, each alleging that the failure to provide the undiscovered reports amounted to error at either the trial or at the sentencing hearing. We dispose of these issues by addressing the prejudice alleged to have been caused the defendant.

First, relying upon *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, defendant argues that these reports contained significant information concerning the defendant's family history which would have substantially affected the proceedings in mitigation. The defendant says that the existence of these records sheds light on the defendant's "troubled youth" and, because the trial court did not have the benefit of seeing these reports, it could not have considered its information in sentencing. Therefore, defendant's argument continues, the sentence must be overturned.

In sentencing, the court took into consideration all the evidence adduced at trial as well as the evidence presented during the aggravation and mitigation phase of the sentencing proceedings. (See *Wright*, 111 Ill. 2d at 167-68.) During trial, the defendant was examined by Silverman concerning his relationship with his family. This testimony included giving information about his adoption; the abuse by his natural parents which led to his being placed for adoption; his shoe fetish, when it be-

gan and the problems which it caused him; abuse by his adoptive mother; and his history of institutionalization. During the mitigation proceedings, Dr. Traugott also spoke of defendant's history of institutionalization.

The medical records which were unavailable at trial contain a detailed family history which included an analysis of defendant's adoptive mother and father. However, a review of these reports indicates that they discuss much of the same information provided at trial by the defendant, albeit in a more professional and detailed manner. The evidence contained in the records reveals little more and we cannot say that the failure to introduce this history prejudiced the defendant.

The standards by which claims of prejudice are judged is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Using this standard, we cannot say that the additional evidence made available by the discovery of these new records would have had a substantial impact upon the weighing of aggravating and mitigating factors. The sentencing court found a significant number of aggravating factors present. (See part IV herein for a discussion of the aggravating factors found to exist by the sentencing court.) The additional information contained in the reports does not begin to "tip the balance."

Defendant's second argument is that the failure to present these additional records at the sentencing hearing affected the mitigation proceedings, as evidence of defendant's mental health history was kept from the court, and thereby violated his eighth amendment and fourteenth amendment rights.

The defense has not convinced us that defendant was prejudiced by this conduct either. First, the sentencing court was well aware of defendant's 15-year history of

institutionalization within the mental health system. Second, as the State argues, introduction of these records at trial would have provided much evidence which could have been used by the sentencing court in aggravation and would have prejudiced defendant. These records state repeatedly that defendant is *not* sick and detail a history of violent behavior.

For example, a report written in 1973, before defendant was discharged, states, "It is the opinion of the JRU treatment staff that he [defendant] is neither 'sick' nor in need of mental treatment. Furthermore, it is felt that the label 'mentally ill' was little more than a convenient excuse that allowed Mr. Wright to avoid personal responsibility for his own acts. *** Any anti-social acts that Mr. Wright may commit in the future would be more appropriately handled by the Department of Corrections rather than the Department of Mental Health." A review of the information contained in these records leads us to conclude that the failure to introduce these pages could not have prejudiced the defendant any more than introducing them at the hearing could have done. Therefore, contrary to the assertions of defendant, we cannot say that the failure to introduce these records in mitigation to show defendant's mental health history prejudiced defendant.

Third, defendant also asserts that the failure of defense counsel to examine at trial any of the doctors who had treated the defendant or to present these mental health records to the jury was ineffective and prejudiced the defendant. However, as we have already concluded, it was not unreasonable for counsel not to have known of the existence of any records beyond that which he already possessed and effectively used throughout the adversarial process and therefore would not have known of the existence of many of these doctors. Also, as we have just shown, the information contained in the records

may have harmed defendant in the eyes of the jury and would have cast doubt on defendant's guilty but mentally ill theory.

As support for his argument, defendant cites this court's opinion in *People v. Greer* (1980), 79 Ill. 2d 103, where the court said, "The failure to interview witnesses may indicate actual incompetence [citation], particularly when the witnesses are known to trial counsel and their testimony may be exonerating [citation]." (*Greer*, 79 Ill. 2d at 123.) As we have already disposed of the performance issue above, we conclude this argument is without merit. However, in addressing this argument, we note that many of the witnesses were not known to trial counsel, nor would the testimony which they could have supplied have been necessarily exonerating. As previously shown, much of the material contained within the reports casts a shadow upon the character of the defendant.

The failure of counsel to call as witnesses any individuals who had rendered an opinion on defendant's sanity during his stay at institutions did not amount to the prejudice which defendant asserts. Defendant must show that there is a reasonable probability that the proceedings would have concluded differently had counsel performed as suggested, and defendant cannot make that showing here.

We therefore conclude that defendant's claim of ineffective assistance of counsel must fail. Rather, our review of counsel's performance indicates that he vigorously pursued a defense on behalf of defendant.

## II

The second issue raised is whether the post-conviction court's denial of defendant's motion seeking funds to appoint an additional psychiatric expert was an abuse of

the court's discretion and amounted to a violation of defendant's due process and equal protection rights.

## Abuse of Discretion

Defendant first alleges that the post-conviction court erroneously ruled that it did not have discretion to appoint a psychiatrist in this matter on post-conviction. We disagree with defendant's contentions.

Post-conviction proceedings exist to allow those convicted of crimes to raise issues of deprivation of constitutional rights. (Ill. Rev. Stat. 1989, ch. 38, par. 122—1.) The Post-Conviction Hearing Act has been liberally construed to allow convicted persons an opportunity to advance claims of constitutional deprivation. (*People v. Pier* (1972), 51 Ill. 2d 96.) Post-conviction proceedings are governed by the provisions of the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*) and Supreme Court Rule 651(c) (134 Ill. 2d 651(c)).

These provisions have been interpreted as allowing the post-conviction judge to exercise a great deal of discretion in resolving post-conviction petitions. For instance, section 122—5 of the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—5) grants the post-conviction court the discretion to allow the withdrawal of the post-conviction petition at any time. Further, this section gives to the post-conviction court the discretion to make any order regarding pleadings or amendments to pleadings that the court feels is proper.

Section 122—6 (Ill. Rev. Stat. 1989, ch. 38, par. 122—6) also grants to the court the discretion to receive in support of the petition any kind of evidence, be it affidavits, depositions, oral testimony or other proof. Section 122—6 gives the court the discretion to bring the defendant before the court where necessary.

The decisions in which we have had occasion to consider the issue of the post-conviction court's discretion-

ary powers affirm the conclusion that the post-conviction judge is afforded great latitude in hearing post-conviction matters. For instance, in *People ex rel. Daley v. Fitzgerald* (1988), 123 Ill. 2d 175, this court allowed the post-conviction court to order the taking of discovery depositions of several persons involved in the original trial proceedings, stating, "Neither authorized nor prohibited by rule or statute, the discovery order entered here was, we believe, within the trial judge's inherent authority." *Fitzgerald*, 123 Ill. 2d at 183.

Post-conviction counsel McIntire filed a motion with the court seeking the appointment of a psychiatric expert to examine the defendant in light of the discovery of the new medical reports. Defendant argues that the post-conviction court misstated the law, thereby erring, when it denied the petition, stating, "As the record stands at this point, counsel, in light of the examination of this defendant by two psychiatric experts at the time of trial, I do not believe that I can or should grant this motion." Defendant interprets this comment to mean that the post-conviction court did not feel it had the discretion to appoint a psychiatrist.

However, without commenting upon the amount of discretion granted to the post-conviction court in this matter, we decline to interpret this statement as defendant suggests. Rather, this phrase strikes us as being ambiguous, with a number of meanings to be attributed it. In fact, the next statement made by the post-conviction court casts doubt on defendant's interpretation. The court further stated, "Well, my remarks were intended to indicate that my mind is open on the matter. And if a showing is made that further expert testimony would be helpful to the court in resolving the issues, I will consider your request, Mr. McIntire."

Defendant argues that Dr. Traugott had a "vested interest" in maintaining his earlier diagnosis that deter-

mined that defendant was not suffering from any mental illness beyond a fetish and that it is erroneous to allow his testimony to justify the denial of defendant's motion for another psychiatric examination. However, without more than a mere unsubstantiated allegation, we cannot agree that a professional doctor would deny a man sentenced to lose his life a fair examination of his mental status merely to maintain the integrity of an earlier diagnosis. This is especially so where Dr. Traugott's evaluation appears to be substantiated with sound reasoning.

Further, in light of the fact that one psychiatric expert had reviewed these records to determine their value to these proceedings and evaluated defendant in light of these records, we conclude there was no abuse of discretion in this case.

Dr. Traugott, the psychiatrist who had testified on behalf of defendant at the sentencing hearing, was asked to review these records and to reevaluate defendant's mental state in light of the information contained therein. In 1989, McIntire attempted to depose Dr. Traugott. Dr. Traugott told McIntire that, in forming his original opinion of defendant's mental state, he had had the benefit of examining certain records secured from the Department. These records received from the Department apparently indicated only that defendant suffered from a fetish and made no other psychiatric diagnoses.

Before the deposition began, McIntire handed to Dr. Traugott the records recently obtained from the Department. Dr. Traugott noted that a number of these pages had not been in his possession at the time that he originally testified, and these records indicated that defendant had been diagnosed with schizophrenia, chronic undifferentiated type; schizophrenic reaction, undifferentiated type; sociopathic personality disturbance with sexual deviation; sociopathic personality make-up

with sexual deviation; mental deficiency mild associated with sexual deviation, transvestism; and psychoneuroses.

The deposition was continued to allow the doctor to review the additional medical reports. At the continued deposition, Dr. Traugott stated that, in his opinion, the defendant was not suffering from schizophrenia in 1983 when the crimes were committed. Dr. Traugott also observed that schizophrenia is a life-long illness which can be controlled by medication but, because he believed that defendant did not suffer from schizophrenia at all, he was not in a state of remission when examined by the doctor.

When asked by McIntire if the earlier diagnosis of schizophrenia was a "misdiagnosis," the doctor stated that "diagnostic nomenclature" had changed since the 1950s and 1960s and, having reviewed the documents with which he had been supplied, he found "insufficient evidence within the records to establish a diagnosis of schizophrenia." Dr. Traugott also noted that defendant was never treated for schizophrenia and the reports never described the symptoms necessary to support a diagnosis that defendant was a schizophrenic.

Specifically, Dr. Traugott stated:

"This particular document on page A5 is interesting in that the diagnosis [of schizophrenia] is listed there. There is nothing within the body of the report above that that [sic] they observed behavior and thought patterns on which that diagnosis was based. The person recording the diagnosis is identified as a mental health specialist II and is approved by another mental health specialist II. I don't know their qualifications. My assumption would be based on the record and what it was lacking in the description that this was a diagnosis that someone had used before and was merely restated on this form."

Dr. Traugott further revealed:

"Within those documents [exhibits A9 through A62] the diagnosis 'chronic and differentiated schizophrenia' ap-

pears on a number of different occasions. Within the reports in exhibit 2, there was only one note which indicated that there was the presence of an auditory hallucination. There was no description within that note which would describe it as the type of hallucination that a schizophrenic would have. There is no indication within the record that the patient was ever treated with a neuroleptic for that condition, which is a common treatment for it. And medications were available back in 1956, which was the date of the earliest report in here that I've seen. Furthermore, thorazene was offered to Mr. Wright in one hospitalization and this was for nervousness. In that report it also identified a diagnosis of schizophrenia, but the psychiatrist did not give the medication at all for schizophrenia. *So, we have a number of reports, none of which describe the symptoms necessary to make the diagnosis of schizophrenia and none of the reports carry any indication that he was truly treated for the diagnosis of undifferentiated schizophrenia."* (Emphasis added.)

Thus, Dr. Traugott's testimony indicates that he carefully studied the new medical records and analyzed his evaluation of defendant in light of these records. Therefore, we cannot conclude that the denial to appoint an additional psychiatric expert was an abuse of the court's discretion.

### Due Process/Equal Protection

The post-conviction court's refusal to appoint another psychiatric expert also did not violate defendant's constitutional rights. Defendant argues that the refusal to appoint another psychiatric expert denied him his rights of due process and equal protection. We conclude that these arguments are without merit.

First, we address defendant's contention that failure to appoint a psychiatric expert amounted to a violation of defendant's due process rights. We are aided in determining that there was no due process violation by the

decision of the Supreme Court in *Ake v. Oklahoma* (1985), 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087.

Ake was charged with murdering a couple and wounding their two children. At the arraignment, Ake's behavior was so abnormal that the trial judge ordered a psychiatric examination " 'for the purpose of advising with the Court as to his impressions of whether the Defendant may need an extended period of mental observation.' " (*Ake,* 470 U.S. at 71, 84 L. Ed. 2d at 58, 105 S. Ct. at 1090.) After several examinations, Ake was found to be suffering from schizophrenia. None of the doctors who had examined Ake had, however, examined him with regard to his sanity at the time of the offense.

At a pretrial conference, Ake's counsel requested the appointment of a psychiatrist to determine Ake's mental state at the time at which the crime was committed to support Ake's defense of insanity. This request was denied.

The jury rejected Ake's plea of insanity and found him guilty of the offense. The case was eventually appealed to the Supreme Court, where the Court determined that indigent petitioners who raise a defense of insanity should be granted a psychiatric examination by the court. As *Ake* stated, to decide otherwise would implicate concerns of due process and fundamental fairness.

However, the *Ake* Court stated, "[T]he obligation of the State is limited to provision of *one* competent psychiatrist ***." (Emphasis added.) (*Ake,* 470 U.S. at 79, 84 L. Ed. 2d at 63, 105 S. Ct. at 1094.) The Court then specifically limited the right it had just recognized to the provision of one competent psychiatric examination.

In the instant case, *two* psychiatric experts were appointed at the time of trial to examine the mental state of the defendant. Upon the discovery of several pages of medical reports, outlining defendant's previous mental

health history, one of these psychiatrists was asked to re-evaluate his opinion in light of these new records for the post-conviction proceedings. The concerns of *Ake* have been met. Defendant was given the opportunity to have his mental condition evaluated in three instances; the State has given the defendant "access to the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77, 84 L. Ed. 2d at 62, 105 S. Ct. at 1093.

We likewise conclude that there was no deprivation of defendant's equal protection rights. Defendant argues that the only thing which kept him from having had a third psychiatric evaluation is the fact that he is an indigent petitioner. Defendant's argument implies that, if he was not indigent, he would be able to pay an expert himself and, because he was denied access to a psychiatric expert due to his status as an indigent, this denial amounts to a violation of equal protection principles.

Citing *Mayer v. City of Chicago* (1971), 404 U.S. 189, 30 L. Ed. 2d 372, 92 S. Ct. 410, defendant argues that there "can be no equal justice where the kind of trial a man gets depends upon the amount of money he has." However, the Constitution does not require that the States provide identical rights but merely protects against invidious discriminations among classes of individuals. (See *Ross v. Moffitt* (1974), 417 U.S. 600, 612, 41 L. Ed. 2d 341, 352, 94 S. Ct. 2437, 2444; *San Antonio Independent School District v. Rodriguez* (1973), 411 U.S. 1, 24, 36 L. Ed. 2d 16, 37, 93 S. Ct. 1278, 1291-92.) As the United States Supreme Court stated, "And the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to

present his claims fairly in the context of the State's appellate process." (*Moffitt*, 417 U.S. at 616, 41 L. Ed. 2d at 354, 94 S. Ct. at 2447.) Where the defendant in this case has had the benefit of a psychiatric evaluation in light of the newly discovered mental health records, he has had an "adequate opportunity" to present his claims that he is suffering from schizophrenic delusions. We are not required to give defendant the further opportunity to "psychiatrist shop."

Here, defendant's rights were not violated where he was appointed a psychiatric expert, at State expense, to evaluate his mental condition and where that expert reevaluated his conclusions in light of new documentation. Defendant may claim a deprivation of equal protection rights because this psychiatric expert was not an *independent* psychiatrist. We wholly concur that this expert was not independent; he was chosen by the defendant and asked to testify on behalf of the defendant.

Previous opinions of this court and the lower courts of this State have recognized that there is no constitutional requirement that we duplicate the rights of a particular class of individuals in post-conviction proceedings. For instance, in *People v. Porter* (1988), 122 Ill. 2d 64, the court found no violation of equal protection principles where indigent post-conviction petitioners complained that counsel was not immediately appointed to aid in filing post-conviction relief. There this court recognized, " 'there is no disparate treatment between indigent and nonindigent post-conviction petitioners as all are subject to dismissal regardless of whether they are represented by counsel if their petitions are found to be frivolous and patently without merit.' " *People v. Porter* (1988), 122 Ill. 2d 64, 78, quoting *People v. Mason* (1986), 145 Ill. App. 3d 218, 226 (*rev'd on other grounds sub nom. People v. Porter* (1988), 122 Ill. 2d 64).

In *People v. Baugh* (1985), 132 Ill. App. 3d 713, the court considered the issue of treating indigent defendants differently for purposes of direct appeal in contrast to post-conviction proceedings. It was determined that there was a rational basis for treating defendants differently at the two proceedings as, in the direct appeal, the State has the burden of proof; however, in post-conviction, the defendant has the burden of coming forward. See also *Mason*, 145 Ill. App. 3d 218; *People. v. Ross* (1985), 139 Ill. App. 3d 674.

Defendant argues in his brief that the State can afford greater protections than are available under the Federal Constitution. Although it is not clear what protections defendant wishes us to make greater, our disposition of the issues leads us to conclude that it is not necessary to address this contention.

We therefore conclude that the failure of the post-conviction court to authorize additional funds for further psychiatric evaluation did not amount to an abuse of discretion nor did it violate defendant's due process or equal protection rights so as to amount to a deprivation under either the Federal or the State Constitutions.

### III

The third issue raised by the defendant in support of his post-conviction petition for relief is that post-conviction counsel failed to comply with the requirements set forth in Supreme Court Rule 651(c) (134 Ill. 2d 651(c)) where post-conviction counsel failed to supplement the post-conviction petition with affidavits or other documentation. Defendant concedes that post-conviction counsel did supply to the court affidavits saying that he had obtained mental health records of defendant from the Department and the Social Security Administration and did supply copies of these records. However, defendant argues that, to comply with Rule 651(c), counsel should

have supplied affidavits to support or lend credibility to the mental health records. Because counsel did not do so, defendant's argument continues, counsel cannot file a certificate indicating that he has complied with Rule 651(c) in good faith. As the record is clear that post-conviction counsel substantially complied with the mandate of Rule 651(c), we conclude that this argument is wholly without merit.

Rule 651(c) states:

"(c) Record for Indigents; Appointment of Counsel. Upon the timely filing of a notice of appeal in a post-conviction proceeding, if the trial court determines that the petitioner is indigent, it shall order that a transcript of the record of the post-conviction proceedings, including a transcript of the evidence, if any, be prepared and filed with the clerk of the court to which the appeal is taken and shall appoint counsel on appeal, both without cost to the petitioner. *The record filed in that court shall contain a showing, which may be made by the certificate of the petitioner's attorney, that the attorney has consulted with petitioner either by mail or in person to ascertain his contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petition filed pro se that are necessary for an adequate presentation of petitioner's contentions.*" (Emphasis added.) 134 Ill. 2d R. 651(c).

The rule follows this court's decision in *People v. Slaughter* (1968), 39 Ill. 2d 278, where the court stated, "The statute can not perform its function unless the attorney appointed to represent an indigent petitioner ascertains the basis of his complaints, shapes those complaints into appropriate legal form and presents them to the court." (*Slaughter*, 39 Ill. 2d at 285.) The concern addressed here is to ensure that post-conviction petitioners receive adequate representation when presenting claims under the Post-Conviction Hearing Act. (*People v. Brown* (1972), 52 Ill. 2d 227; *People v. Drew* (1976), 36

Ill. App. 3d 807.) However, in post-conviction proceedings, the petitioner is only provided with a "reasonable" level of assistance of counsel. *People v. Owens* (1990), 139 Ill. 2d 351, 364.

In *Owens*, the defendant argued that his counsel had failed to comply with Rule 651(c) because counsel had failed to introduce certain evidence in support of the claim raised by defendant. The court rejected this argument and held:

"As stated, Rule 651(c) requires the record to show that counsel consulted with the petitioner, examined the trial record and amended the *pro se* petition when necessary to reflect the contentions to be presented. [Citation.] The record clearly shows that petitioner's counsel complied, insofar as compliance was possible, with Rule 651(c). *** Because the record demonstrates that petitioner's counsel adequately presented the petitioner's ineffective-assistance claim, we reject the petitioner's contention that his post-conviction counsel did not comply with Rule 651(c)." *Owens*, 139 Ill. 2d at 367-68.

As in *Owens*, here there is no violation of Rule 651(c) where post-conviction counsel has consulted with the petitioner on numerous occasions, amended defendant's petition and argued several motions, all requiring a thorough review of the record. Additionally, post-conviction counsel stated during argument of a motion, in response to an inquiry posed by the post-conviction court, that he had reviewed the entire record.

On July 5, 1988, McIntire filed an amendment to defendant's *pro se* petition for post-conviction relief. In addition to alleging a violation of his sixth amendment rights because the additional medical reports were not introduced, as the *pro se* petition contends, the petition was amended to include allegations of a deprivation of constitutional rights in that counsel did not seek to have an additional psychiatric expert appointed in order to re-

evaluate the defendant's mental state at the time of the murder in light of these additional reports. The petition also alleged that certain testimony had been deleted from a taped statement made by the defendant.

Defendant requested the opportunity to change this amended petition and subsequently was allowed to delete a paragraph and to change "Charleston Police Department" to "Mattoon Police Department."

On July 13, 1988, McIntire forwarded a letter to the judge reporting on the status of defendant's case. In this letter, McIntire reported that he had obtained mental health records from the Social Security Administration and that he and his "associate" had been able to "boil down" the records from the Department.

In the course of preparing for the post-conviction hearing, a motion was made by McIntire seeking the appointment of an expert witness. The stated reason for this motion was that records detailing defendant's history of schizophrenia had been recently uncovered and it appeared that the psychiatric experts at trial, Dr. Fowler and Dr. Traugott, had not had the opportunity to study these reports. This motion was denied. McIntire also argued, at defendant's request, a motion seeking a new judge. This motion was also denied.

On February 1, 1989, the defendant filed three motions with the court concerning McIntire's representation. In these motions, defendant admitted to having had a number of conversations with his attorney. For instance, in the first motion, defendant stated, "counsel of record in the above entitled matter[ ] has acknowledged by telephone conversations, letters and face-to-face conversations that he will send copies of everything he has in his possession pertaining to Defendant-Petitioner Patrick Wright, which he had received from various people and facilities." Furthermore, the record is replete with

references made by McIntire indicating that he had conferred with the defendant.

McIntire filed a motion for continuance with the post-conviction court seeking more time to become better prepared to argue the post-conviction petition. During the arguments for that motion, McIntire stated, "I would further indicate that counsel has been cooperative in getting the record on appeal to me. I have been through that several times and am familiar with it. I have had a chance to examine the file that Mr. Silverman and Mr. Deadman [sic] had prepared and have examined its contents, noticed in there the presence of certain items, the absence of others which will ultimately bear on the issues in this case."

Later, while arguing a different motion, the following exchange took place:

"THE COURT: Well, Mr. McIntire, you weren't present at the trial, but I have presumed you have reviewed the record in this case.

MR. McINTIRE: Yes, Your Honor. I have reviewed the report of proceedings as it was furnished to the Illinois Supreme Court."

While McIntire appears to have met the requirements of Rule 651(c), providing a reasonable level of assistance to the defendant, we recognize that no certificate was filed in this case by counsel to support that defendant was given adequate assistance with his post-conviction petition. However, several cases have held that, where it is clear that counsel has complied with the requirements of Rule 651(c), the failure to supply a Rule 651(c) certificate results in harmless error. See, e.g., People v. Alexander (1990), 197 Ill. App. 3d 571; People v. Bone (1987), 154 Ill. App. 3d 412.

The purpose of requiring a certificate is to ensure that the requirements of Rule 651(c), ensuring that post-conviction petitioners receive adequate representation

such that their claims of constitutional deprivation are set forth, have been met. Because the requirements of Rule 651(c) have been substantially complied with, we agree that the failure to supply a certificate in this instance amounted to harmless error.

## IV

The last issue raised by defendant, in a supplemental brief, requests a new sentencing hearing because the sentencing judge relied upon "residential burglary" as one felony to justify the existence of a statutory aggravating factor.

Despite the fact that the court found the presence of one mitigating factor (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2) ("the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution")), the court also found the presence of several aggravating factors. Namely, the court found the presence of a statutory aggravating factor under section 9—1(b)(6)(c) of the Criminal Code of 1961, finding that "the murdered individual had been killed by the defendant during the course of various felonies, including armed robbery, attempt rape, home invasion and residential burglary."

That section states:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

\* \* \*

6. the murdered individual was killed in the course of another felony if:

\* \* \*

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, aggravated arson,

burglary, home invasion, indecent liberties with a child, or the attempt to commit any of the felonies listed in subsection (c)." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)(c).

The court also found the existence of premeditation on the part of the defendant in the commission of this crime in that the defendant planned to break into a residence that evening and specifically reviewed several possible scenes for this crime. Defendant brought with him into the crime scene the "equipment necessary to consummate these offenses," including a knife.

The court also noted that the victims were defenseless and not able to resist defendant's actions at the time of the crime; Carol Specht was bound and gagged and Connie Specht was naked, "begging for mercy" at the time at which the defendant slashed her with his knife. Further, the defendant spent one hour after the crime was committed concealing evidence, leading the court to believe "that the defendant's powers of reason were dominating over any extreme mental distress he was suffering on the night in question."

Defendant's argument relies upon this court's decision in *People v. Simms* (1991), 143 Ill. 2d 154. Darryl Simms was convicted of murder, aggravated criminal sexual assault, criminal sexual assault, armed robbery, home invasion and residential burglary. Simms was sentenced to death after the jury returned a general verdict finding him eligible for the death penalty. The jury, before beginning deliberations, was instructed that defendant was eligible for the death penalty if he committed a murder during the course of a felony which was " 'one of the following: aggravated criminal sexual assault, home invasion, armed robbery, residential burglary.' " *Simms*, 143 Ill. 2d at 169.

At the time at which Simms was sentenced, residential burglary was not among the listed felonies which supported the finding of an aggravating factor. (Ill. Rev.

Stat. 1987, ch. 38, par. 9—1(b)(6).) The court found this error in jury instructions "sufficiently grave as to have deprived the defendant of a fair sentencing hearing." *Simms*, 143 Ill. 2d at 170.

The United States Supreme Court has recognized that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." (*Zant v. Stephens* (1983), 462 U.S. 862, 881, 77 L. Ed. 2d 235, 252, 103 S. Ct. 2733, 2745.) Applying this principle, the court vacated Simms' death sentence and remanded for a new sentencing hearing. *Simms*, 143 Ill. 2d at 171-72.

In the instant case, we initially recognize that this is not a *Simms* case. Defendant in this case was found eligible for death by agreement of the parties, stipulating as to the evidence produced at trial, and aggravating and mitigating factors were weighed by the sentencing court and not by a jury. The sentencing court made specific findings in this case, whereas the *Simms* jury returned a general verdict. The concerns expressed by the Supreme Court and cited in *Simms* are therefore not applicable in this case. Here, we know exactly what factors were relied upon to reach this verdict and we therefore recognize that defendant's verdict "did not rest exclusively on the insufficient ground."

More relevant to the resolution of this issue is our decision in *People v. Jackson* (1991), 145 Ill. 2d 43. In *Jackson*, the jury returned five specific verdict forms, sentencing defendant to death. We therefore distinguished *Simms*, on this basis, and recognized that the fact that three of the five verdict forms was defective was not serious enough to warrant ordering a new sentencing hearing; there still existed sufficient grounds making Jackson eligible for the death penalty. (*Jackson*,

145 Ill. 2d at 118-19.) Likewise, the fact that the sentencing court relied upon "residential burglary" as partially justifying the imposition of the death penalty is not serious enough to warrant a new sentencing hearing.

*Jackson* also notes that, during the second phase of the sentencing hearing, " 'the jury was free to consider any relevant and reliable evidence in aggravation and mitigation' " regardless of whether it was listed as a statutory factor. (*Jackson*, 145 Ill. 2d at 118, quoting *People v. Coleman* (1989), 129 Ill. 2d 321, 346.) We see no reason that these same concerns should not apply where sentencing is determined by the court. Therefore, defendant's final argument must also fail.

For the foregoing reasons, we deny post-conviction relief and affirm the judgment of the circuit court of Coles County. The clerk of this court is directed to enter an order setting Tuesday, November 10, 1992, as the date on which the sentence of death entered by the circuit court shall be executed. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A certified copy of this order shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the correctional institution wherein defendant is confined.

*Affirmed.*