Hector Reuben SANCHEZ,
Petitioner–Appellant,

v.

Jerry D. GILMORE, Warden, Pontiac
Correctional Center, Respondent–
Appellee.

No. 98–2734.

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1999.

Decided Sept. 1, 1999.

Rehearing En Banc Denied Oct. 20, 1999.

Robert H. Farley, Jr., Naperville, IL; Stephen E. Eberhardt (argued), Tinley Park, IL, for Petitioner–Appellant.

David H. Iskowich (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL; Deborah L. Ahlstrand, Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Respondent–Appellee.

Before BAUER, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Fifteen years ago Hector Reuben Sanchez was found guilty by an Illinois jury on several charges, including murder, attempted murder, rape, aggravated kidnapping, and deviant sexual assault. The jury concluded that Sanchez killed 21–year–old Michelle Thompson by strangling her after she was abducted and raped. The jury also found that Sanchez shot and seriously wounded Thompson's friend, Rene Valentine. In the second phase of the trial the

jury determined that Sanchez should be sentenced to death.

At trial, Valentine testified that he and Thompson met at a Gurnee, Illinois, disco called "D. Laney's" on the evening of February 3, 1984. An hour after midnight, Valentine and Thompson were sitting in a car outside of D. Laney's when two men approached from behind. During the trial, Valentine testified that one of the men pulled him out of the car, led him to a nearby alley, and shot him. Valentine positively identified Sanchez as the culprit.

More damning trial testimony came from Walter Peters, Sanchez's companion on the evening of February 3. By the time of Sanchez's trial, Peters had already been tried and convicted for his role in Thompson's murder but had not been sentenced. Peters testified that he, Sanchez, and a man named Forest Heinz were surveying the layout of the Normandie Restaurant, near D. Laney's, with the intent to burglarize it later that night. . After taking Heinz home, Peters and Sanchez (according to Peters' testimony) returned to the area and, upon seeing Valentine and Thompson alone in the parking lot, approached the pair. Peters said that Sanchez led Valentine away while he (Peters) pulled Ms. Thompson into his car. Peters said he heard a gunshot and then Sanchez returned to the car and reported that he had shot Valentine.

With Thompson handcuffed in the car, the two kidnappers drove to Sanchez's house in nearby Waukegan. After forcing Thompson inside the house, Sanchez raped her. Then, after hog-tying her with nylon cord (in addition to the handcuffs), Peters and Sanchez left the house for a short time. When the two returned to the room where Thompson had been bound, she was gone. They found her, unclad from the waist down, screaming for help outside a neighboring house. Sanchez led her back into his house and then returned to the neighbor's house to smooth things over.

When he returned from the neighbor's, Sanchez forced Thompson into the basement, where he raped her again and, upon finishing the assault, asked Peters if he "wanted any." Peters testified that he declined. Sanchez then strangled Thompson with a nylon cord and tightly wrapped a wire hanger around her neck. He then slammed her head into the floor and gave her lifeless body a couple of kicks for good measure. The two men collected Thompson's clothing (again, according to Peters) and jewelry and burned them in the fireplace. They then loaded Thompson's body into Sanchez's car, drove across the state line, and dumped her body in a rural area of Milwaukee County, Wisconsin.

In addition to the testimony of Valentine and Peters, Gene Gonyo, Sanchez's neighbor, testified that he heard a woman screaming outside his door around 1:30 a.m., and that he saw Sanchez lead the woman away from his house. Gonyo said he later saw Sanchez's car cruise down the driveway, lights off, and turn toward Wisconsin.

Scientific evidence—hair samples, fibers, etc.—that added weight to the State's case against Sanchez was also introduced during the trial. Actually, more evidence of Sanchez's guilt was admitted, but what we have already noted is sufficient to demonstrate that the State had a reasonably strong case and that the verdict was supported by substantial evidence if that evidence was believed by the jury. And by its verdict, the jury showed that it believed the State's case.

The case was set to move to its sentencing stage the day after the jury returned its guilty verdicts. But things slowed down the next morning when the judge was told by jailers that Sanchez had tried to commit suicide. Sanchez, it seems, broke the lenses of his eyeglasses and used the broken pieces of glass to cut his arm. Sanchez was taken to a hospital and released in short order after treatment for his injuries. Sanchez was then returned to court where he met with his attorneys. Defense counsel reported that Sanchez

was distraught and that he wanted his mitigation witnesses sent home. Counsel also related that Sanchez said he attempted to take his own life because he thought society was going to do it. Defense counsel requested that the jury be discharged and the sentencing hearing postponed until Sanchez had "gotten a hold of himself" and was able to cooperate more fully with counsel. Asked by the judge whether Sanchez was able to communicate with his attorneys, counsel replied that he seemed different from when he had spoken to him the preceding night. As evidence of the defendant's inability to "cooperate," counsel said that Sanchez had ordered the attorney to do the opposite of what counsel had intended to do. Following this colloquy, the trial judge concluded that there was no bona fide doubt as to Sanchez's fitness to proceed on to the sentencing phase of the trial. The judge denied the defense postponement motion, and the penalty hearing got under way. Sanchez waived a jury determination on his eligibility for the death penalty and the judge found him eligible. The jury then reconvened for the second stage of the penalty phase. The government's aggravation evidence related primarily to the unsolved 1975 murder of a woman named Sharon Egerer, which two witnesses (one a participant in the crime) pinned on Sanchez. Sanchez took the stand at the sentencing hearing and denied responsibility for either Michelle Thompson's death or the murder of Ms. Egerer. Sanchez testified about his abusive relationship with his father; he testified that, despite being functionally illiterate, he held the same job for 15 years and saved enough money to buy a house; he testified that he helped his family even while in prison. Unmoved, apparently, by these pleas, the jury sentenced Sanchez to death.

Sanchez filed a number of direct and collateral attacks and, ultimately, the Illinois Supreme Court rendered three opinions, the first in 1986 and the last one 10 years later. *People v. Sanchez*, 115 Ill.2d 238, 104 Ill.Dec. 720, 503 N.E.2d 277 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 745 (1987); *People v. Sanchez*, 131 Ill.2d 417, 137 Ill.Dec. 629, 546 N.E.2d 574 (1989); and *People v. Sanchez*, 169 Ill.2d 472, 215 Ill.Dec. 59, 662 N.E.2d 1199, *cert. denied*, 519 U.S. 967, 117 S.Ct. 392, 136 L.Ed.2d 308 (1996). In federal court, Sanchez filed a premature petition for a writ of habeas corpus in 1990, but that was dismissed without prejudice for failure to exhaust state remedies. In 1997, Sanchez filed the present petition for a writ of habeas corpus, the denial of which by the district court is before us on this appeal.

■ Sanchez's appeal raises issues regarding his sentencing proceeding but he tosses in an undeveloped claim that the Illinois Death Penalty Act is unconstitutional. On this point, in less than one page, Sanchez contends that the Illinois statute is infirm because, in his words, it "places a burden on a defendant to prove that the death penalty should not be imposed." This argument fails under *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), where the United States Supreme Court held that so long as a state's method of allocating burdens of proof does not lessen the state's burden to prove every element of the offense charged, or in a case like this to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

■ One other matter can be quickly addressed before moving to the guts of this appeal. Sanchez maintains that his petition is not governed by the 1996 amendments to 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act (AEDPA), because he filed his first petition for relief in 1990. But we deal here with his second petition filed in 1997, and that is the year which controls whether AEDPA applies. It applies; he cannot

move the date to pre-AEDPA times by relying on his old unexhausted petition.

 Under AEDPA federal courts give deference to state court merit adjudications. To procure habeas relief under AEDPA a petitioner is required to show that state court determinations under review are either "contrary to" or employ an "unreasonable application of" federal law as determined by the United States Supreme Court. § 2254(d)(1). A petitioner can also attack a state court's adjudication on the grounds that it is based "on an unreasonable determination of the facts," but such attacks are accompanied by a rigorous burden of proof: state court factual findings are presumed to be correct unless the petitioner rebuts the presumption with "clear and convincing" evidence. § 2254(e)(1). Although state court legal conclusions, as well as mixed questions of law and fact, are reviewed *de novo*, that standard is also · tempered by AEDPA's deferential constraints: the "criterion for assessing the reasonableness of a state court's application of Supreme Court case law, pursuant to § 2254(d)(1), is whether the determination is at least minimally consistent with the facts and circumstances of the case." *Sweeney v. Parke*, 113 F.3d 716, 718 (7th Cir.1997). The upshot of all of this is that federal review is now severely restricted; the fact that we may think certain things could have been handled better by the state trial judge or by the prosecuting attorney or by a state reviewing court means very little.

Sanchez claims that after his suicide attempt the state trial judge should have held an evidentiary hearing to determine whether he was competent to proceed. Tangentially, he claims the waiver of his right to have a jury determination of his eligibility for the death penalty was not voluntary because he was not competent at the time.

 There is no question that Sanchez was competent to proceed through the guilt portion of his trial. Unlike the defendant in *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), Sanchez's competency to proceed during that phase of the trial was never questioned. But *Drope* teaches that even when a defendant is competent at the start of a trial, courts must "be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id.* at 181, 95 S.Ct. 896.

After the suicide attempt, Sanchez's attorney reported that his client was "distraught" and not cooperating; counsel also said, as we previously noted, that Sanchez told him to send his witnesses home. But nothing that was reported to the judge suggested legal incompetency to proceed from a defendant who had previously been of unquestioned competency. On top of that, the state trial judge saw Sanchez and observed his conduct (especially when he was questioned about his jury waiver on the eligibility question), and that was enough to convince him that Sanchez was not incompetent to continue. Although it would have been preferable to hold an evidentiary hearing right after the suicide attempt was reported and nail the matter down once and for all, we cannot condemn the trial judge's decision not to do so; after all, he observed Sanchez's demeanor and heard, firsthand, counsel's reports of his condition. As matters proceeded, the judge personally heard Sanchez's responses to questions, and nothing he heard caused him to doubt that Sanchez was indeed competent. Nor can we condemn the Illinois Supreme Court's decision to affirm the trial judge's decision to move forward with sentencing. That decision was not an unreasonable application of the rule in *Drope*. We add further the obvious: being "distraught" about the possibility of being sentenced to die at the hands of the State does not demonstrate a failure to understand and appreciate the nature of the proceedings; on the contrary, it's a quite lucid reaction to a very chilling situation.

Finally, to justify an evidentiary hearing to explore the possibility of Sanchez's competency to continue with the trial, he had to produce "clear and convincing evidence [raising a] threshold doubt about his competency." *Nguyen v. Reynolds*, 131 F.3d 1340, 1346 (10th Cir.1997), quoting from *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir.1980). The Supreme Court of Illinois concluded that Sanchez had not demonstrated sufficient doubt about his competence, and that determination is far from an unreasonable application of law as established by the United States Supreme Court.

■ Sanchez goes on to argue that his jury waiver resulted from his incompetence. He doesn't explain why, however, preferring instead to rely on an inference that no reasonable defendant would waive his right to a determination by a jury that his crimes warranted the imposition of the death penalty. We reject that inference. Sanchez is certainly not the first defendant to waive full jury participation in the death penalty phase of a case; in fact, defendants often concede eligibility and move directly to the aggravation-mitigation phase of a sentencing hearing. That decision, in and of itself, does not demonstrate incompetence, and because Sanchez offered nothing more, no hearing was required. *See Tenner v. Gilmore*, 184 F.3d 608, 613–14 (7th Cir.1999). Furthermore, we emphasize again that the trial judge saw Sanchez up close and personal. The judge heard responsive answers by Sanchez, given in a rational, lucid manner, to questions about his waiver. Plus, Sanchez did not engage in irrational conduct in court that red-flagged a questionable mental state.

■ Sanchez next argues that the prosecutor crossed the line during his cross-examination of Sanchez at the sentencing hearing. The Illinois Supreme Court disagreed with Sanchez on this issue, and we must affirm that decision unless it is contrary to federal law. It was not. The single question Sanchez challenges—the prosecutor asked Sanchez whether he could think of any factor in mitigation to preclude a death sentence—was not so serious that it infected the entire sentencing hearing. *See Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Sanchez's attorney objected to the question, the trial court sustained the objection, and the questioning continued in an appropriate manner. Given all of the other evidence in aggravation, and given that Sanchez himself admitted that the crimes (if in fact he committed them) were horrendous, we cannot say that the single controversial question swayed the jury's deliberations. It certainly wasn't enough to deprive Sanchez of a fair hearing.

■ Sanchez argues that the state court erred in denying his petition (under § 2–1401 of the Illinois statutes) for relief from the judgment. He sought relief under § 2–1401 based on the statement of Oscar Cartegena, an inmate in Milwaukee County jail who said he saw Thompson's abduction from D. Laney's. Cartegena, who was in jail with Sanchez, swore in a statement that Sanchez played no role in the abduction or in Valentine's shooting. This is perhaps the most troubling of Sanchez's claims and represents yet another instance in which the standard of review constrains what we can do. Based on Cartegena's statement, Sanchez moved for a new trial under § 2–1401 of the Illinois code. At the hearing on Sanchez's petition, Cartegena was called to testify but he refused, invoking the Fifth Amendment. After determining that Cartegena's invocation of the Fifth Amendment was legitimate, the trial judge found that Sanchez was not entitled to relief. We agree. Sanchez suggests that the court merely accepted Cartegena's "say so" that his testimony would subject him to incrimination. But the record doesn't support that parsing of the facts. The judge weighed and considered the testimony and ultimately concluded that Cartegena's invocation of the Fifth Amendment was legitimate. We said this aspect of the case is troubling, and it is. In the second (1989) *Sanchez*

opinion from the Illinois Supreme Court, Justice Ryan dissented because, although he had no idea what Cartegena would have said, he thought the court "should have the benefit of all information available" before affirming a death sentence. We think Justice Ryan got it right. But that's really not the issue here. The question before us is whether the Illinois Supreme Court's decision on the 2–1401 petition was consistent with federal law. It was. Even Justice Ryan conceded that the Illinois Supreme Court's decision on this issue was supported by (i.e., consistent with) law. Finally, Sanchez argues that his attorneys provided ineffective assistance at the penalty phase because they failed to offer substantial evidence in mitigation. Going directly to the merits of this claim, we find it untenable. The record shows that Sanchez's attorneys put him on the stand to describe to the jury how his father abused him and how he was generally treated cruelly as a child. Sanchez testified that, despite his tragic start in life, he got a job and kept it for nearly 15 years; he saved enough money to buy a house; and he took care of his family. Sanchez's attorneys called his family members to tell the jury how well he had treated them. And the attorneys elicited that Sanchez had no record of criminal convictions. Perhaps there was more Sanchez's attorneys could have put on—Sanchez doesn't tell us what that evidence might have been—but we find no flaw in the Illinois Supreme Court's decision that the attorneys' conduct did not rise to the level of incompetence required by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (defendant must show first that counsel's performance was deficient and, second, that counsel's deficient performance was so serious that it deprived defendant of a fair hearing).

For these reasons, we affirm the district court's decision denying Sanchez's habeas corpus petition.

RIPPLE, Circuit Judge, concurring.

I concur in the judgment of the court. The majority opinion covers adequately all but one of the arguments raised by Mr. Sanchez. I write separately to address the argument that my colleagues do not address. This is a death case, and I believe it is especially important that we state our views as comprehensively as possible. Our obligation to the litigants requires that we do; our obligation to the Supreme Court requires that we do.

*Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), makes clear that state courts have a continuing obligation to address, throughout the state proceedings, whether the defendant was competent at the time of trial. In this case, additional evidence as to whether Mr. Sanchez was competent at the time of sentencing came to light after trial. Mr. Sanchez now contends that the state courts did not fulfill their responsibility under *Drope* to evaluate properly the evidence that came to light during the post-conviction review. He contends that this evidence, when evaluated in light of the situation that arose at trial just prior to the penalty phase, raises a substantial question about his competency to participate in the proceedings at that time. As we did in *Tenner v. Gilmore*, 184 F.3d 608 (7th Cir.1999), we therefore must decide whether the state courts adequately addressed the issue of this new evidence during the post-conviction review proceedings. My review of the record and of the decisions of the state courts on postconviction review convinces me that the state courts' assessment of the new evidence was in conformity with the constitutional principles set out by the Supreme Court of the United States. On habeas review, this court must accept the state courts' well-founded conclusions. Therefore, I must conclude that the district court properly denied the writ of habeas corpus and its judgment ought to be affirmed.