**Patrick H. WRIGHT, Petitioner,**

v.

**Roger COWAN, Warden of Menard Correctional Center, Respondent.**

No. 93–2105.

United States District Court, C.D. Illinois.

July 11, 2001.

Alan Freedman, Bruce H. Bornstein, Gary Prichard, Freedman & Bornstein, P.C., Chicago, IL, for plaintiff.

Arleen C. Anderson, Michael M. Glick, Office of the Attorney General, Chicago, IL, for defendant Roland W. Burris.

William L. Browers, Colleen M. Griffin, Office of the Attorney General, Chicago, IL, for defendant Roger Cowan.

### ORDER

BAKER, District Judge.

Patrick H. Wright filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 on May 26, 1993. The matter was stayed pending resolution of state court

matters, but is now ready for a ruling. For the following reasons, the court denies the petition for a writ of habeas corpus with respect to the guilt-innocence phase of the trial, but grants the writ with respect to the death sentence subject to the conditions discussed below.

## BACKGROUND

Wright was charged with murder, attempted murder, attempted rape, armed robbery, home invasion, and residential burglary. The state alleged that Wright broke into the home of Carol Specht and her daughter, Connie, and attempted to rape them both. He then stabbed Carol Specht in the back, and slashed Connie Specht's throat. Connie survived, but her mother did not. In support of those allegations, the state offered Wright's taped confession, the testimony of Connie Specht, and corroborating physical evidence.

Wright did not contest the state's version of events at trial, but asserted that he suffered from a serious mental illness amounting to insanity. The sole evidence offered in support of that defense was Wright's own testimony. He testified about abuse his natural parents inflicted upon him before his adoption at age four. He discussed his fetish for women's shoes, and stated that he believed it constituted a mental disease or defect. Since the age of seven, he had used women's shoes for sexual gratification, causing his adoptive mother to beat him out of frustration. When he was thirteen, Wright began a fifteen-year period of institutionalization at various mental hospitals. He testified that his shoe fetish was the reason for the institutionalization, and that he believed he had never been cured. He explained that he served time in jail intermittently between 1973 and 1982 for crimes such as theft and burglary, which he committed in an effort to gratify his desire for women's shoes.

Wright testified that he committed the crimes at issue after entering the victims' apartment to look for shoes. Once inside, he had "this out-of-mind situation", which led to the death of Carol Specht and the attempted murder of her daughter. He stated that he was simply unable to control his conduct while in the apartment. In rebuttal, the state offered the testimony of a psychiatrist, Dr. Gerald Fowler, who said that Wright was not insane or mentally ill. He classified Wright's disorder as a non-pathological psychosexual disorder. Dr. Fowler believed that at the time he entered the Spechts' apartment, Wright was able to appreciate the criminality of his conduct and to conform to the law's requirements.

On September 19, 1983, Wright was convicted in the Circuit Court of Coles County, Illinois of murder, attempted murder, attempted rape, armed robbery, home invasion, and residential burglary. He waived a jury for sentencing, and the trial court sentenced him to death. It concluded that he was under extreme mental stress at the time of the crimes as "the result of the personality disorder he suffered, his women's shoe fetish." Nevertheless, the court noted that defense counsel "did not point out any other mitigating factors that the court should consider at this point," and refused to consider any sympathy engendered by Wright's pitiful life story. The court found that the crime was premeditated, and that the victims were defenseless. The court also found it significant that Wright was capable of trying to dispose of evidence within an hour of the crime.

Wright appealed directly to the Illinois Supreme Court, and raised the following issues: (1) probable cause did not support his warrantless arrest; (2) the trial court

erred when it prevented defense counsel from cross-examining the surviving victim as to Wright's sanity at the time of the offense; (3) the state deprived Wright of the right to a fair trial when it failed to comply with discovery rules; (4) Illinois' death penalty statute is unconstitutional; and (5) the trial court erred when it refused to consider its sympathy for Wright as a mitigating factor. The court affirmed his conviction and sentence on October 19, 1985. *People v. Wright,* 111 Ill.2d 128, 95 Ill.Dec. 787, 490 N.E.2d 640 (1985) (*"Wright I"*). The United States Supreme Court denied certiorari the following year. *Wright v. Illinois,* 479 U.S. 1101, 107 S.Ct. 1327, 94 L.Ed.2d 179 (1987).

Wright filed a petition for post-conviction relief on August 18, 1987. That petition was denied without an evidentiary hearing on January 19, 1990. On appeal to the Illinois Supreme Court, Wright raised the following issues: (1) trial counsel was ineffective for failing to discover additional records of petitioner's mental health treatment; (2) the trial court erred when it refused to appoint a third psychiatric expert on post-conviction proceedings; and (3) the trial court's improper reliance on residential burglary to justify in part its decision to impose the death penalty warranted a new sentencing hearing. The court affirmed the trial court's dismissal of the petition on June 25, 1992. *People v. Wright,* 149 Ill.2d 36, 171 Ill.Dec. 424, 594 N.E.2d 276 (1992) (*"Wright II"*). The United States Supreme Court denied certiorari the following year. *Wright v. Illinois,* 506 U.S. 1004, 113 S.Ct. 613, 121 L.Ed.2d 547 (1992).

On May 26, 1993, Wright filed a petition for writ of habeas corpus. The court appointed counsel. On July 13, 1993, the respondent filed an answer. Shortly thereafter, on September 1, 1993, Wright moved for summary judgment. Later that month, however, he filed a second amended post-conviction petition in state court. He then moved to stay the proceedings in this court pending exhaustion of state court remedies. The court granted the stay.

The trial court eventually dismissed Wright's second amended petition, and he once again appealed to the Illinois Supreme Court. He alleged the following claims: (1) the trial judge had presided under a conflict of interest because he had previously prosecuted Wright for the armed violence conviction, which the state used as impeachment at trial and in aggravation at sentencing; (2) trial counsel was ineffective for not raising the issue of the judge's conflict, and appellate counsel was ineffective for not raising trial counsel's ineffectiveness on appeal; (3) the prosecutor had a conflict of interest because she served as Wright's attorney on the previous armed violence case; (4) trial counsel was ineffective for failing to investigate, argue, and introduce available evidence that Wright should be found guilty but mentally ill ("GBMI"); and (5) trial counsel was ineffective for failing to investigate and introduce available mitigating evidence of Wright's mental deficiency and psychological problems. On November 18, 1999, the court affirmed the trial court's dismissal of the petition. *People v. Wright,* 189 Ill.2d 1, 243 Ill.Dec. 198, 723 N.E.2d 230 (1999) (*Wright III* ). The United States Supreme Court then denied certiorari. *Wright v. Illinois,* 531 U.S. 836, 121 S.Ct. 94, 148 L.Ed.2d 54 (2000).

## ANALYSIS

In his original petition, Wright alleged ten claims. He has since withdrawn three of them. Accordingly, only the following seven claims remain:

1) Wright was deprived of effective assistance of counsel at trial because coun-

sel failed to argue, investigate, and introduce available evidence about Wright's mental health;

2) His rights under both the Fourteenth and Eighth Amendments were violated because the trial judge believed that the law precluded him from considering Wright's traumatic childhood and lifelong history of mental health problems as mitigating evidence in imposing a sentence;

3) Wright was deprived of his right to due process of law because the trial court considered and relied on evidence from outside the record of other murder cases in sentencing Wright to death;

4) The Illinois Supreme Court, after finding that the trial court used an improper aggravating factor, erred by failing to re-weigh independently the aggravating and mitigating facts, remand the case, or engage in harmless error analysis;

5) The trial judge who presided over Wright's trial and sentenced him to death had a conflict of interest arising from his role as the prosecutor in Wright's 1979 armed violence conviction, which was relied upon by the judge as an aggravating factor;

6) Wright was deprived of his right to due process of law because the prosecutor in this case had represented Wright in the 1979 armed violence charge; and

7) The Illinois Death Penalty Statute is unconstitutional.

■ Wright filed his petition for a writ of habeas corpus before April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Because the AEDPA's amendments to the habeas corpus statute do not apply, the court will analyze Wright's claim under the prior law. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Abrams v.*

*Barnett*, 121 F.3d 1036, 1037 (7th Cir. 1997). Before the AEDPA, federal courts deferred to a state court's findings of fact, but disregarded its legal conclusions and reached independent judgments on constitutional issues. *Koo v. McBride*, 124 F.3d 869, 872 (7th Cir.1997). The pre-AEDPA scheme also permitted reliance on other courts' jurisprudence in addition to Supreme Court case law in determining whether a conviction was contrary to clearly established federal law. *Abrams*, 121 F.3d at 1037.

■ Before considering the merits of a habeas petition, however, a federal court must ensure that the petitioner has overcome two procedural hurdles: exhaustion and procedural default. *Henderson v.. Thieret*, 859 F.2d 492, 496 (7th Cir.1988), *cert. denied*, 490 U.S. 1009, 109 S.Ct. 1648, 104 L.Ed.2d 163 (1989). Failure to exhaust all state remedies bars consideration of the petition. Likewise, failure to raise all claims during the course of state court proceedings bars consideration of those claims not raised. *Henderson*, 859 F.2d at 496. Furthermore, federal courts may not review a state court's denial of a state prisoner's federal constitutional claim if the decision rests on an independent and adequate state ground. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). That doctrine "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729–30, 111 S.Ct. 2546. Where a state court has plainly stated that a procedural bar prevents it from deciding the issue on appeal, federal courts may not review the merits of the issue. *Harris v. Reed*, 489 U.S. 255, 266, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989).

The respondent argues that all of Wright's claims lack merit, and that the first, fifth, and sixth claims are procedurally defaulted because Wright failed to present them adequately to the state courts. With the aforementioned principles in mind, the court now turns to Wright's claims for relief.

*Claim 1: Trial counsel was ineffective for failing to argue, investigate, and introduce available evidence about Wright's mental health*

■ Wright argues that defense counsel, Brian Silverman, was ineffective for failing to argue, investigate, and introduce available evidence that Wright should be found GBMI. Specifically, he claims that Silverman should have discovered approximately fifty pages of medical records from Wright's stays at various mental institutions. He also alleges that Silverman was ineffective for failing to offer in the guilt-innocence phase of the trial the testimony of a psychiatrist to establish that Wright was mentally ill.

In support of this claim, Wright offers Silverman's deposition testimony. Silverman testified that he considered Wright's mental state to be the most important issue in the case. In preparation for trial, he investigated evidence to support a claim of insanity, or at least a verdict of GBMI. He requested discovery and that a psychiatrist be appointed to examine Wright.

Although Silverman sought Wright's medical records, he did not get all of them; he never received about fifty pages of records. At the time, he did not know that these missing records existed. He blames this deficiency on the Illinois Department of Mental Health and Developmental Disabilities, which he explained was "not a very competent agency." Silverman never, however, attempted to subpoena records from individual hospitals. The overlooked records indicate that Wright had I.Q. test scores of eighty-one and seventy-three, which classifies him as a person of borderline mental deficiency and mild impairment. The records further note Wright's history of taking prescription psychiatric drugs, and corroborate Wright's testimony about his traumatic life before his adoption at age four. The records also corroborate Wright's allegation that his adoptive parents abused him as well. This abuse contributed not only to his shoe fetish, but also to a nervous condition causing continuous trembles throughout his body, difficulty accepting a masculine role, low frustration and tolerance level, childlike and schizophrenic thinking, and the capability to function only in a highly structured setting.

Silverman also failed to consider whether Wright suffered from organic brain damage. He did not know that testing for organic brain damage existed at the time of trial. Nor did he offer during the guilt-innocence phase of the trial the testimony of Dr. Arthur Traugott, who at sentencing opined that Wright was mentally ill, although not legally insane. He explained that the shoe fetish controlled Wright's lifestyle and led to his institutionalization and incarceration. He testified that the crimes at issue were the result of Wright's anger and frustration as opposed to any pre-planning. He testified that although the shoe fetish caused Wright to break into the Spechts' apartment and would always be with him, the fetish did not cause him to commit the acts of violence against the victims. Instead, Dr. Traugott believed that Wright failed to think straight when frustrated.

In his deposition, Silverman stated that he chose to focus Wright's entire case on an insanity defense, to the exclusion of a GBMI verdict. He considered a GBMI verdict to be a "fraud" and a "sham." He

analogized his all-or-nothing strategy as aiming for an A rather than a B on a test. He therefore chose not to call Dr. Traugott because he was afraid the state would be able to elicit on cross-examination his opinion that, although Wright was mentally ill, he was not insane. Silverman offered no expert to testify that Wright was insane; he instead relied on both Wright's testimony that he had an "out-of-body experience" and his ability to cross-examine the state's expert witnesses. Silverman conceded, however, that Wright's testimony went poorly.

At the penalty phase, Silverman's strategy was to convince the judge that Wright was emotionally disturbed, albeit not so disturbed that he had a defense to the crimes. Silverman believed that the trial judge would not impose the death penalty if he found Wright to be emotionally disturbed. And even if he did sentence Wright to death, Silverman reasoned, the reviewing court would not uphold the sentence in light of Wright's emotional disturbance. In his deposition, he stated that the additional medical records probably would not have been particularly helpful. He testified that the additional evidence would have been merely cumulative, and introducing cumulative evidence might have annoyed the jury.

Wright also provides an affidavit from psychologist Dr. Michael Gelbart, who conducted neuropsychological testing on Wright. He found that Wright exhibits neuropsychological dysfunction in the areas of sensory perception, motor skills, memory, learning, and problem solving. Deficits in these areas render Wright slow to acquire and encode new information, and unable to account for much of the information available to him. These deficits limit his learning ability, impair his ability to reason and act appropriately under stress. Moreover, they make him more inclined toward disinhibition and impulsivity. These neurocognitive deficits are in addition to and exacerbate his psychiatric problems. Dr. Gelbart stated that Wright's neurological dysfunction suggests organic brain damage in the temporal and frontal lobe areas of the brain, and that this condition has probably afflicted him for some time. Further, he stated, the extent of Wright's dysfunction and his history of mental illness indicates organic personality syndrome, which involves persistent personality disturbances.

Wright argues that Silverman was ineffective for failing to uncover and offer the foregoing evidence. Silverman testified that from the very start of the case, he knew that Wright's mental state was the most important issue. In fact, he did not believe there were any other legitimate issues once a pretrial motion to suppress was denied. He did not get the medical records at issue, however, because he did not know they existed. Nor did he have Wright tested for neurocognitive defects, which would have helped develop his argument that Wright's mental state diminished his culpability.

Moreover, Wright asserts, Silverman was ineffective for failing to call Dr. Traugott as a witness during the guilt-innocence phase of the trial. Wright argues that counsel based his decision to offer Dr. Traugott's opinions only at sentencing on a fundamental misunderstanding of the law concerning the GBMI verdict. Furthermore, he claims, Silverman could have called Dr. Traugott to testify that Wright was mentally ill without subjecting him to cross-examination as to Wright's sanity. According to Wright, Dr. Traugott's opinion about Wright's sanity would have been outside the scope of direct examination, and therefore the state would have been barred from eliciting this opinion.

Wright argues that none of Silverman's errors was the result of reasonable trial strategy. Moreover, he claims, there is a reasonable probability that he would have been found GBMI but for Silverman's deficient performance. Silverman chose to present a case for GBMI and insanity based solely on Wright's self-serving testimony. The jury was consequently forced to choose between Wright's testimony and the expert testimony of the state's expert witness. Had the jury heard Dr. Traugott's opinion that Wright was mentally ill, and had it known about Wright's low I.Q., his history of being prescribed psychiatric medication, and the further effects of his traumatic childhood, it might have returned a GBMI verdict. This evidence would have significantly corroborated Wright's testimony and defense. At the very least, the court might have imposed a different sentence had counsel presented the additional mitigating evidence.

The respondent asserts that Wright has procedurally defaulted his claim of ineffective assistance of counsel. He argues that although Wright alleged in his first post-conviction petition that counsel was ineffective for failing to introduce certain records at sentencing, he did not allege this claim as to the guilt-innocence phase. Wright eventually challenged in his second post-conviction petition his attorney's failure to introduce evidence in support of a GBMI verdict, but the Illinois Supreme Court held that he had waived the claim by failing to raise it in his first petition. *Wright III*, 243 Ill.Dec. 198, 723 N.E.2d at 239. And even though the court in *Wright II* remarked that the additional records might have impacted the GBMI defense, that comment does not establish that Wright actually raised the claim himself. A review of Wright's brief on that appeal, he notes, demonstrates that the only reference to a trial error is a vague statement that Wright was denied a "fair trial."

Thus, he argues, the court's finding of waiver in *Wright III* was not error.

In any event, the respondent points out, the Illinois Supreme Court found that counsel conducted an investigation and did everything necessary to get the mental health reports at issue. The court further found that no prejudice resulted from the omission of these records from the trial court proceedings. The fifty pages of mental health records at issue were often repetitive and largely duplicative of evidence already before the court. Moreover, Silverman received an extensive number of psychiatric documents from the prosecutors. Dr. Traugott, the psychiatrist who examined Wright, then contacted the Department of Health and requested all documents in its possession concerning Wright. Thus, at the time of trial, Silverman reasonably believed that he had received all relevant information and records from the Department, making further investigation unnecessary. To find that counsel was ineffective for failing to get the other fifty pages of records would be to hold him to an unreasonably high standard.

Moreover, the respondent argues, the additional evidence would not have made a difference. The trial judge and jury knew about Wright's history of institutionalization. The additional reports do not establish that he was insane. In fact, one remarked that the label "mentally ill" was little more than an excuse by Wright to avoid taking responsibility for his actions. And although a few of the reports referred to schizophrenia, Dr. Traugott testified in his deposition that the label did not apply to Wright; what is more, the reports did not indicate that the person making the reference was qualified to diagnose Wright.

As discussed above, this court may not review the state court's denial of Wright's federal constitutional claim if the decision of the state court rests on an independent and adequate state ground. *Coleman,* 501 U.S. at 729, 111 S.Ct. 2546. That doctrine bars federal habeas relief when a state court declined to address a prisoner's federal claims because he had failed to meet a state procedural requirement. *Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546. Thus, if the Illinois Supreme Court declined to rule on the ineffective assistance of counsel claim because Wright failed to present it properly, this court may not review the merits of the issue. *Harris,* 489 U.S. at 266, 109 S.Ct. 1038.

The court has reviewed the parties' briefs on appeal from the denial of both the first and second post-conviction petitions. Those briefs reveal that Wright did raise in the first petition the issue of counsel's failure to discover and introduce the additional mental health information. The respondent argues that Wright limited this claim to the sentencing phase, and did not discuss the potential effect his failure to introduce the additional evidence had at the guilt-innocence phase. But even a cursory reading of Wright's brief on appeal from the first petition demonstrates that he argued vigorously that trial counsel's ineffectiveness tainted both phases.[1] He therefore presented this issue fairly to the state courts, and is entitled to a review on the merits.

In that first petition, however, he did not claim that counsel was ineffective for failing to focus specifically on getting a verdict of GBMI as opposed to not guilty by reason of insanity. For that reason, the Illinois Supreme Court found that it was waived when he raised it in the second petition. Based on this court's review of the briefs and the state court decisions, it finds that the state court's refusal to consider the issue on the merits was based on an independent and adequate state ground. Wright is therefore not entitled to substantive review on this particular claim.

▬ Accordingly, the court limits its inquiry to the issue of omitted evidence pertaining to Wright's mental health, as opposed to the wisdom of counsel's strategy to pursue exclusively an insanity defense. There is a "strong presumption that counsel rendered reasonably effective assistance," *United States v. Limehouse,* 950 F.2d 501, 503 (7th Cir.1991) (*citing Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), and that the challenged conduct "might be considered a sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. To establish prejudice under *Strickland,* a defendant must satisfy a similarly high threshold. "[A] criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (*quoting Strickland,* 466 U.S. at 687, 104 S.Ct. 2052); *see also Eddmonds v. Peters,* 93 F.3d 1307, 1313 (7th Cir.1996) (noting that "[p]rejudice in the *Strickland* sense refers to 'unprofessional errors' so egregious 'that the trial was rendered unfair and the verdict rendered suspect.'") (*quoting Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). As applied to sentencing in a death penalty case, prejudice requires a showing "that a reasonable probability exists that, but for

---

1. On page 28 of Wright's brief on appeal from the denial of the first post-conviction petition, he sets forth an argument under the heading

"The failure to present the evidence contained in these reports also severely undermines confidence in the outcome of the trial."

**534**

counsel's substandard performance, the sentencer 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (*quoting Strickland*, 466 U.S. at 695, 104 S.Ct. 2052). Failure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim. *See Velarde v. United States*, 972 F.2d 826, 828 (7th Cir. 1992).

 Where an attorney fails to introduce evidence because he was unaware of its existence, the omission cannot be deemed the result of trial strategy. *See Cunningham v. Zant*, 928 F.2d 1006, 1016–18 (11th Cir.1991); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.1989); *People v. Perez*, 148 Ill.2d 168, 170 Ill.Dec. 304, 592 N.E.2d 984, 994 (1992). In some cases, an attorney who does not introduce mental health records because he never investigated that evidence fails to satisfy prevailing professional norms. *See Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (holding that trial counsel's failure to obtain and introduce juvenile and social service records constituted ineffective assistance of counsel, notwithstanding the fact that portions of the records at issue contained information harmful to the defendant's argument); *see also Brewer v. Aiken*, 935 F.2d 850, 857–58 (7th Cir.1991); *Middleton v. Dugger*, 849 F.2d 491, 493–94 (11th Cir.1988); *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987). Resolution of this claim will depend on the nature and extent of the information available to counsel but not introduced into evidence, as well as the strength of the aggravating evidence presented by the prosecution. In addition, deference must be accorded to strategic decisions made by counsel after suitable investigation. *Hall*, 106 F.3d at 749.

Here, counsel did not know that the additional records existed; nor was he aware that Wright could be tested for organic brain damage. His decision not to pursue these avenues therefore cannot be characterized as strategy. Furthermore, the court is not convinced that the evidence would have been merely cumulative. During trial, the only evidence the jury heard about these matters came from Wright himself. The jury was likely to disregard his testimony as self-serving; and, to make matters worse, the trial record demonstrates clearly that Wright was an atrocious witness. Thus, what the respondent disregards as cumulative evidence of Wright's background is better characterized as corroboration of otherwise dubious testimony. Moreover, even if the evidence would not have changed the jury's verdict, it might have helped Wright at sentencing. The only evidence defense counsel offered in mitigation was the testimony of Dr. Traugott, who opined that Wright was mentally ill but not insane. The court also considered the evidence put forth at trial, which of course included Wright's testimony about his background. But, like the jury, the judge might have weighed that evidence more heavily if counsel had offered corroboration.

 Simply because counsel did not perform perfectly, however, does not mean he was constitutionally deficient. A defense attorney's investigation need not be unlimited in scope or unerring in execution, but merely reasonable. *Rogers v. Israel*, 746 F.2d 1288, 1294 (7th Cir.1984). Here, although he did not get each and every mental health record, counsel did receive a great deal of information from the state as part of discovery. In addition, Dr. Traugott requested from the state health agency all of Wright's records, and received nearly all of them. So it is not as if counsel ignored obvious avenues in his

pursuit of mitigating evidence. As for prejudice, with the exception of Wright's I.Q. scores, the records offered little new information. Thus, even if the evidence of Wright's background had been corroborated, the court cannot conclude that there is a reasonable probability the sentence would have been different.

In sum, the court could not find that counsel was constitutionally deficient without judging him in perfect hindsight. And it could not conclude that his shortcomings prejudiced the outcome of the trial and penalty phases without indulging in impermissible speculation. Wright simply cannot satisfy the rigorous standards set forth in *Strickland,* and the court therefore denies the writ on this claim.

*Claim 2: The trial judge erroneously believed he was precluded as a matter of law from considering Wright's traumatic childhood and lifelong history of mental health problems as mitigating evidence in sentencing him*

 Wright claims that at his sentencing hearing, the trial judge erroneously believed that the law precluded him from considering Wright's traumatic childhood and lifelong history of mental health problems as mitigating evidence. In support of this argument, Wright points to excerpts from the judge's remarks upon sentencing the defendant. The judge stated, "I don't think any reasonable person who has heard all of the evidence in this case can feel anything but sympathy for the pathetic creature, Patrick Wright, ... a man who has wandered the forty wretched years of his life from institution to institution, from prison to prison; the evidence indicating that his fetish for women's shoes being perhaps the one and only purpose for his life." Nevertheless, the judge explained, his sympathy arising from the mitigating evidence of Wright's wretched life was "not an appropriate consideration" in de-

ciding whether to sentence him to death. He went on to explain that "any matters dealing with sympathy have no bearing on whether the defendant shall receive the death penalty."

Wright asserts that the judge's statements indicate that he disregarded mitigating evidence about Wright's background because he erroneously believed the law precluded him from doing so. The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., *concurring* ); *see also Penry v. Lynaugh,* 492 U.S. 302, 322, 109 S.Ct. 2934, 106 L.Ed.2d 256, (1989) ("Because Penry was mentally retarded ... and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, and because of his history of childhood abuse, [a] juror could ... conclude that Penry was less morally 'culpable than defendants who have no such excuse' ").

 Accordingly, in a capital case, the sentencer must not be precluded from considering any mitigating evidence relating to the defendant or the crime. *See, e.g., Eddings v. Oklahoma,* 455 U.S. 104, 111–112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Mitigating evidence is allowed at the penalty phase so the sentencer may consider "compassionate ... factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). The Court has ex-

plained that "[n]othing in any of [its] cases suggests that the decision to afford an individual defendant mercy violates the Constitution." *Gregg v. Georgia*, 428 U.S. at 199, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also Caldwell v. Mississippi*, 472 U.S. 320, 330–31, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

■ The state is not, however, forbidden from guiding how the sentencer considers that mitigating evidence. In *California v. Brown*, the Court found that an instruction telling the jury not to be "swayed by 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' " during the sentencing phase did not violate the Eighth Amendment. *See Brown*, 479 U.S. at 542, 107 S.Ct. 837. It concluded that a reasonable juror would interpret the instruction to ignore mere sympathy "as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence," and that it was not unconstitutional for a state to "prohibi[t] juries from basing their sentencing decisions on factors not presented at the trial." *Brown*, 479 U.S. at 542–43, 107 S.Ct. 837.

■ Thus, the Court concluded in *Brown* that the Constitution permits the state to forbid the sentencer from considering emotions not based on the evidence. From that conclusion, Wright argues, it follows that the Constitution necessarily requires that the sentencer be allowed to consider and give effect to emotions that are based on the evidence. In *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), however, the Court strongly suggested otherwise. The Court in *Saffle* ultimately rejected the petitioner's claim under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). In reaching that decision, however, the Court in dicta disagreed with the petitioner's argument that an anti-sympathy instruction might lead the jury to disregard not only their emotional reaction to mitigating evidence, but also the evidence itself. The Court noted the difference between restricting what mitigating evidence the jury is permitted to consider in making its sentencing determination, and guiding the jury's consideration of that evidence. *Saffle*, 494 U.S. at 490, 110 S.Ct. 1257.

The respondent argues that the trial judge did in fact consider all of the mitigating evidence in determining Wright's sentence. He simply decided that sympathy alone was not sufficient to preclude the death penalty. He notes that the trial judge found that Wright acted under extreme emotional disturbance when he committed the crime. That finding, he argues, demonstrates that the judge considered evidence pertaining to Wright's poor mental condition. Moreover, the judge agreed to consider all the evidence presented at trial, which included Wright's testimony about his history.

Wright replies that the statutory factor "extreme emotional disturbance" is distinct from non-statutory mitigating factors such as childhood trauma or a lifelong history of mental health problems. Accordingly, the judge's consideration of Wright's extreme emotional disturbance did not necessarily encompass the other non-statutory mitigating factors.

Moreover, Wright asserts, the judge's additional statements belie the respondent's interpretation that the judge weighed all the mitigating evidence, but merely refrained from allowing his emotional response to that evidence to influence his decision. After stating the limitations he believed applied to his consideration, he went on to say that he "gave great consideration to whether other mitigating factors exist [and that he was] unable to determine the existence of any mitigating factors within or

without the statute with the exception of [the statutory mitigating factor of extreme mental or emotional disturbance at the time of the crime]." This statement unequivocally demonstrates, Wright argues, that the judge did not consider evidence of Wright's traumatic youth and institutionalization in mitigation. From these remarks, Wright concludes that the judge believed he was somehow precluded, as a matter of law, from considering Wright's non-statutory mitigating evidence simply because that evidence also evoked an emotional response of sympathy. In light of those remarks, he asserts, the respondent's argument that the judge considered the evidence but simply disregarded his emotional response thereto is nonsense.

This claim presents a close question. It is very clear under *Brown* that the judge was allowed—and perhaps required—to render his decision based on the evidence and not on his personal emotional response to that evidence. The court therefore does not agree that a court must consider sympathy so long as it is based on evidence. Taken alone, the judge's remark that sympathy was "not an appropriate consideration" in deciding whether to sentence Wright to death suggests that he considered all the evidence but merely disregarded his emotional response.

When considered in light of his other statements, however, his express refusal to consider sympathy is more complicated. As Wright points out, the judge further stated that the only mitigating evidence he found to weigh against the aggravating factors was evidence of Wright's extreme mental and emotional disturbance at the time of the crime. He specifically stated that he could find the existence of no other mitigating factors "within or without the statute." The respondent argues that the extreme mental and emotional disturbance

factor encompasses the evidence of Wright's pitiful life up until that point; but that interpretation renders the words "at the time of the crime" meaningless. Just because the judge considered Wright's mental disturbance at the time of the offense, that does not mean he also considered his traumatic youth. *See Wright I*, 95 Ill.Dec. 787, 490 N.E.2d at 657 (Clark, CJ., *dissenting* ).

The issue before the court has little to do with the proper role of sympathy in capital sentencing decisions. No case requires a court or jury to consider sympathy. If this court were to provide relief on that basis, it would violate the Supreme Court's clear prohibition against the imposition of new rules in habeas cases. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (prohibiting use of new rule of constitutional law established after a petitioner's conviction has become final to attack the conviction on federal habeas corpus unless narrow exceptions apply). But when taken in context, the trial judge's comments that he refused to consider sympathy suggest that he also failed to consider the evidence giving rise to that sympathy. Refusing to consider mitigating evidence violates the mandate of *Eddings*, which was decided the year before Wright's trial. As noted above, the judge specifically stated that he could discern no mitigating factors except for Wright's extreme emotional disturbance at the time he committed the offense. But Wright presented evidence of a horrible childhood; surely that qualifies as mitigation. If the judge considered this evidence, as he was required to do, why would he say that no mitigating factors existed besides Wright's emotional disturbance at the time of the crime? Simply put, he would not. He might find the mitigation of little weight, but he would not say that it did not exist. To derive any other meaning from his plain words re-

quires tortuous reasoning. In sum, the record demonstrates that the trial judge did not consider Wright's mitigating evidence in accordance with the Supreme Court's mandate in *Eddings.* As a result, Wright's death sentence was imposed unconstitutionally, and he is entitled to relief on this claim.

*Claim 3: Wright was deprived of his right to due process of law because the trial court considered and relied upon evidence from outside the record of other murder cases in sentencing Wright to death*

 Wright asserts that the trial court improperly considered and relied upon extrinsic evidence regarding other murder cases in sentencing Wright to death. Specifically, the judge stated that in all his years of legal experience, he had never encountered a murder case more gruesome and heinous than this one.

Wright argues that the judge's remarks demonstrate that he violated the rule set forth in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Gardner was convicted of first-degree murder. The jury recommended a life sentence, but the trial judge sentenced Gardner to death. The judge explained that he was relying in part on confidential information contained in the presentence investigation report. This information was not revealed to the parties; thus, Gardner has no chance to deny or explain the information relied upon by the trial judge. The Court ruled that the judge violated the Due Process Clause when he relied on undisclosed information about Gardner.

Wright argues that in his case, the judge effectively relied on undisclosed information when he compared Wright's crime to all the others he had encountered. Wright could not possibly challenge information about other, unrelated cases. In that respect, he claims, the trial judge violated *Gardner*'s prohibition against relying on

information not disclosed to the defendant. Moreover, "comparative proportionality review" is not a feature of the capital sentencing process in Illinois, and therefore the judge acted improperly when he partially based his decision to impose the death penalty by comparing Wright to other offenders. *See People v. Ruiz,* 194 Ill.2d 454, 252 Ill.Dec. 49, 742 N.E.2d 299, 303 (2000).

In response, the respondent notes that *Gardner* did not involve a judge who relied on his own life experiences, but rather on specific, discrete information about the defendant himself. The prohibition announced in *Gardner* applies when the court relies on ex parte information about the defendant without giving him the opportunity to explain the information. The Court has not extended that holding to cases in which the judge relies on his own general life experience in assessing the proper sentence. In *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the trial judge disregarded the jury's recommendation that the defendant be given a life sentence, and imposed the death penalty. In explaining his decision, the judge compared the defendant's crimes to what he had seen as a soldier in World War II while liberating Nazi concentration camps. The Court rejected the defendant's argument that the judge acted improperly by considering his own experiences. It explained that separating the sentencer's decision from his life experiences would transform the sentencing process into a "rigid and mechanical parsing of statutory aggravating factors." *Barclay,* 463 U.S. at 950–51, 103 S.Ct. 3418. The Court noted that "[a]ny sentencing decision calls for the exercise of judgment. It is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences."

Here, like the judge in *Barclay*, the judge merely assessed the evidence in the context of his own life experiences, which included exposure to other murder cases. To demand that he ignore those experiences would render the sentencing process precisely the sort of "rigid and mechanical" exercise that the Supreme Court has discouraged. *See also Welch v. Burke*, 49 F.Supp.2d 992 (E.D.Mich.1999) (finding no error where the trial judge, in non-capital case, commented on the loss of his own child to impart upon the defendant the magnitude of his crime); *People v. Tye*, 141 Ill.2d 1, 152 Ill.Dec. 249, 565 N.E.2d 931 (1990); *cert denied*, 502 U.S. 833, 112 S.Ct. 112, 116 L.Ed.2d 81 (1991) (finding no error where trial judge in capital case referred to his own experience as a homicide detective in assessing the viciousness of the attack on the victim). Accordingly, Wright is not entitled to habeas relief on this claim.

*Claim 4: The Illinois Supreme Court, after finding that the trial court used an improper aggravating factor, erred by failing to re-weigh independently the aggravating and mitigating facts, remand the case, or engage in harmless error analysis*

■ On appeal from the denial of his first post-conviction petition, Wright argued that the trial court erred when it relied partially upon residential burglary to justify imposition of the death penalty. At the time Wright was sentenced, residential burglary was not among the listed felonies that supported the finding of an aggravating factor. Nevertheless, the Illinois Supreme Court found the error not serious enough to warrant a new sentencing hearing in light of the numerous other aggravating factors expressly relied upon by the trial court. *Wright II*, 171 Ill.Dec. 424, 594 N.E.2d at 290. Wright argues that in so holding, the Illinois Supreme Court violated his rights by failing either

to re-weigh independently the aggravating and mitigating facts, remand the case, or engage in harmless error analysis.

■ The merits of Wright's argument depends on whether Illinois is a "weighing" or a "non-weighing" state. The Supreme Court has held that in a "weighing state," an Eighth Amendment violation occurs when the sentencer weighs an invalid aggravating circumstance in reaching the ultimate decision to impose the death penalty. Thus, when a reviewing court invalidates an aggravating factor, the court must either re-weigh the evidence without the aggravating factor, or determine that the sentencer's error in weighing the improper factor was harmless. *See Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Wright argues that Illinois is a weighing state; and therefore his Eighth Amendment rights were violated when the reviewing court did not re-weigh the evidence despite the trial court's partial reliance on an improper factor. *See Morgan v. Illinois*, 504 U.S. 719, 721–22, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (describing the "balance" of aggravating and mitigating factors that occurs at the second stage of an Illinois capital sentencing hearing).

■ Wright misconstrues Illinois' capital sentencing scheme. Illinois is not a weighing state. A weighing state is one in which the sentencer may not consider any evidence in aggravation except for the statutory factors used at the eligibility phase. *Stringer v. Black*, 503 U.S. 222, 229–30, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Both the Illinois Supreme Court and the Seventh Circuit have recognized that Illinois is a non-weighing state. *People v. Shaw*, 186 Ill.2d 301, 239 Ill.Dec. 311, 713 N.E.2d 1161, 1182 (1999) (*citing* 720 Ill.Comp.Stat. § 5⁄1(c) (West 1996)). *Cole-*

man v. Ryan, 196 F.3d 793, 799 (7th Cir. 1999), cert. denied, 531 U.S. 848, 121 S.Ct. 120, 148 L.Ed.2d 75 (2000). Non-weighing capital sentencing jurisdictions are governed by Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Under Zant, a death sentence may still be valid even though imposed by a sentencer who finds the existence of an aggravating factor that is later found invalid. Specifically, the death sentence is valid if the state does not attach additional significance to multiple aggravating factors or to one aggravating factor over another, where the purpose of the still-valid aggravating factors was to narrow the class of persons eligible for the death penalty, and where state law provides for meaningful review of every death sentence. Because Illinois' sentencing scheme does not place any special emphasis on one particular aggravating factor over another, its scheme fits into the Zant mold. Moreover, the aggravating factors only serve to narrow the class of persons eligible for the death penalty, and Illinois provides mandatory and meaningful review of each capital conviction. See People v. Hampton, 149 Ill.2d 71, 171 Ill.Dec. 439, 594 N.E.2d 291 (1992). Thus, Illinois' sentencing scheme does not make it a "weighing state" subject to the requirements set forth in Stringer, 503 U.S. at 229–32, 112 S.Ct. 1130.

In Wright's case, the trial judge found several valid factors in aggravation. He found that the crime was premeditated, that the victims were defenseless, and that Wright's powers of reason were sufficient to allow him to conceal evidence just one hour after he committed the crimes. Wright II, 171 Ill.Dec. 424, 594 N.E.2d at 290. Because these other valid factors existed, under Zant, the Illinois Supreme Court need not have conducted a re-weighing or harmless error analysis. Accordingly, a new sentencing hearing is not required on this claim.

*Claim 5: The trial judge who presided over Wright's trial and sentenced him to death had a conflict of interest arising from his role as the prosecutor in Wright's 1979 armed violence conviction, which was relied upon by the judge as an aggravating factor*

 In 1979, Wright was charged in Coles County with burglary, armed violence, escape, and criminal damage to property. The prosecutor in that case was Paul C. Komada, who was at that time the State's Attorney for Coles County. If convicted on all counts, Wright would have faced a lengthy prison term. However, Komada made a plea offer to Wright's attorney, Nancy Owen, allowing Wright to plead guilty to one count of armed violence and serve a sentence of seven years in prison. Wright accepted the plea offer and was eventually released on December 12, 1982, after serving three years in prison. The crimes at issue in this case were committed just six months later, on June 7, 1983.

Komada, the prosecutor in the 1979 case, became a trial judge and presided over this case. In sentencing Wright to death, he considered in aggravation the 1979 armed violence conviction. Wright alleges that the trial judge had a conflict of interest arising from his role as the prosecutor in the 1979 armed violence case. Certain practices that may be acceptable in noncapital sentencing proceedings are flatly prohibited "in a case in which the judge has decided to sentence the defendant to death." Gardner, 430 U.S. at 357, 97 S.Ct. 1197. Wright suggests that Judge Komada may have regretted his decision to enter into the plea agreement in 1979, as it allowed Wright to be released from prison earlier than he would have otherwise. Moreover, Wright points out, Judge Komada was acquainted with the

victim; these factors may have contributed to his decision to sentence Wright to death.

■ The respondent asserts that Wright has procedurally defaulted this claim. Wright disputes this assertion. In any event, the court need not address the issue of procedural default because the claim lacks merit. The Seventh Circuit has rejected an argument that a per se rule disqualifies a judge from presiding over a trial of a capital defendant whom the judge had previously prosecuted. *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1375 (7th Cir.1994) (en banc). The *Del Vecchio* court held that the defendant must demonstrate actual bias on the part of the judge to show a due process violation. *Del Vecchio*, 31 F.3d at 1375. Wright distinguishes this case from *Del Vecchio* by pointing out that the trial judge in that case only presided over a jury sentencing hearing, while in this case, the judge made the decision. But, as the respondent notes, the holding of *Del Vecchio* was in no way limited to cases in which the trial judge presides over a jury rather than bench sentencing. Wright merely speculates when he asserts that the judge imposed the death penalty because he felt guilty; and speculation is insufficient to establish actual bias. Accordingly, the court must deny Wright relief on this claim as well.

*Claim 6: Wright was deprived of his right to due process of law because the prosecutor in this case had represented Wright in the 1979 armed violence charge*

■ Wright's sixth claim also stems from his 1979 armed violence conviction. His defense attorney in that case was Nancy Owen, who was at that time Coles County's Public Defender. It was Owen who negotiated the plea agreement that allowed Wright to serve only a seven-year sentence.

In 1980, however, she became the Coles County State's Attorney, and prosecuted Wright for the crimes at issue in this case. During the guilt phase of the trial, she impeached Wright with his 1979 conviction, and later used it in aggravation at sentencing. Defense counsel objected both at trial and in a post-trial motion, but the judge allowed the fact of the conviction to be used against Wright. In her deposition, she stated that after the 1983 crimes, she thought, "if the state had asked for more time before [in the 1979 prosecution], he wouldn't have been out to kill Carol Specht in '83." Owen also had attended high school with the victim, Carol Specht. These circumstances, Wright argues, gave rise to a conflict of interest.

As with Wright's fifth claim, the respondent asserts that Wright has procedurally defaulted this claim; and Wright again disputes that assertion. However, as with the previous claim, the court need not address the procedural default issue in this claim because it too lacks merit.

In *Havens v. Indiana*, Havens brought a habeas petition challenging his state court conviction for burglary and the state court's finding that he was a habitual offender. *Havens v. Indiana*, 793 F.2d 143 (7th Cir.1986). He asserted that he had been denied due process because the trial court refused to disqualify the prosecutor, who had represented Havens on unrelated charges four and five years earlier. The Seventh Circuit recognized the ethical complications inherent in the situation, and acknowledged that recusal would have been the better decision. Nevertheless, the court found no constitutional violation. The court noted that the earlier convictions were based on charges wholly unrelated to the burglary charge. The prosecutor's questions on cross-examination

pertained to matters of public record, and did not involve confidential information. Moreover, Haven failed to prove that the prosecutor used to the state's advantage special facts or knowledge gained from the prosecutor's past representation of him. *Havens*, 793 F.2d at 145.

Likewise, in this case, the earlier charges had nothing to do with the crimes at issue here. But even more significantly, the record does not suggest that Owen obtained during her earlier representation of Wright sensitive information that could have been used against him in this case. Owen merely used the fact of Wright's previous conviction for impeachment and aggravation; this fact was a matter of public record. Accordingly, Wright is not entitled to relief on this claim.

*Claim 7: The Illinois Death Penalty Statute is unconstitutional*

In his final claim, Wright asserts that Illinois' death penalty statute is unconstitutional. He concedes that the Seventh Circuit has upheld the constitutionality of Illinois' death penalty, but wants to preserve the issue in case that holding is reversed. *See Sanchez v. Gilmore*, 189 F.3d 619 (7th Cir.1999), *cert. denied*, 529 U.S. 1089, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000). Under *Sanchez*, this court must deny relief on Wright's seventh claim as well.

### CONCLUSION

For the foregoing reasons, this court grants Wright's petition with respect to his death sentence, but denies the petition in all other respects. This court hereby vacates Wright's sentence of death. The state shall have 120 days from the issuance of this order to re-sentence Wright. On the court's own motion, execution of this order is stayed pending appeal by the parties.